IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN LOZANO AND SUSIE LOZANO }
        Plaintiffs, }
v. } CIVIL ACTION NO. H-03-1891
OCWEN FEDERAL BANK, FSB }
        Defendant. }

## OPINION AND ORDER ON SUMMARY JUDGMENT

Pending before the court is the Motion for Partial Summary Judgment of Plaintiffs John R. Lozano and Susie Lozano (hereinafter "the Lozanos" unless referred to individually) (Doc. 35), and the Motion of Defendant, Ocwen Federal Bank, FSB[1] ("Ocwen") for Summary Judgment. (Doc. 36.)

The Lozanos have sued Ocwen for violations of the Deceptive Trade Practices Act (DTPA), violation of the Federal Fair Debt Collection Act, and for a declaratory judgment to set aside the deed from a foreclosure sale of, and to remove the cloud of title on, the Lozano's homestead, covered by a 30-year promissory note which the Lozanos contend they fully paid off by making two lump sum prepayments prior to 1990 in addition to their scheduled payments, seven years before the note was purchased by Ocwen. Ocwen argues that both Texas state and federal statutory and common law preclude the Lozanos from asserting the payments reflected by those checks as a defense to Ocwen's rights under the note. Ocwen argues that none of the note's prior holders' records reflect any of the Lozano's alleged prepayments, any claims to prepayment, or even a dispute about the alleged prepayments. (Doc. 47, p. 2.) Furthermore, Ocwen argues that the Lozanos are barred from asserting that they prepaid their note, "the linchpin" of their arguments according to Ocwen, because the the Lozanos signed forbearance agreements with Ocwen, both acknowledging the debt and modifying it, setting new principal amounts, because the Lozanos filed serial bankruptcies in which they acknowledged their indebtedness, and, because the

---

[1] "Effective July 1, 2005, Ocwen Federal Bank FSB voluntarily dissolved and transferred its mortgage servicing business to Ocwen Loan Servicing, LLC, which has succeeded to the rights and obligations of the former entity." (Doc. 70) For the sake of simplicity, the court will nevertheless refer to the Defendant entity in this action as "Ocwen."

Lozanos deducted the interest they paid on such note on their tax returns. (*Id*.) According to Ocwen, these actions bar their current suit. Finally, Ocwen asserts the Lozano's claims must fail on statute of limitations grounds, because the *D'Oench Duhme*[2] doctrine precludes recovery under these circumstances, and because the Lozanos are estopped, judicially and equitably, from contending that Ocwen does not have the right to collect the indebtedness. (*Id*.)

I.	**Legal Standard : Summary Judgment**

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material; i.e., only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986). The movant need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's claims. *Celotex*, 477 U.S. at 323-25. However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). If it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted to rely upon the complete absence of proof of an essential element. *Fontenot v. Upjohn,* 780 F.2d at 1195. If the

---

[2] A doctrine expressed by the Supreme Court in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447 (1942). The court does not address these arguments as Ocwen has expressed that it is unnecessary in light of the estoppel and limitations arguments. (Doc. 45, p. 1.)

moving party fails to meet its initial burden, the motion must be denied, regardless of the non-movant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ. P. 56(c). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial. Fed. R.Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157. The non-movant may point to evidentiary documents already in the record that set out specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Furthermore, the non-movant does not likewise have to present its own evidence, but may point out genuine issues of fact extant in the summary judgment evidence produced by the movant, if any. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

## II.         Factual & Procedural Background

On April 15, 1980, the Lozanos executed a Deed of Trust and to secure payment under such deed, a Promissory Note (the "Note") in the original principal amount of $76,500 payable to University Savings Association, thereby creating a lien on their homestead known as the property at 13802 Aspen Hollow Lane, Houston, Texas 77082, or the "Aspen Hollow" property. (Doc. 1, "Plaintiffs' Original Petition, Exh. B, ¶ 7.) The Lozanos defaulted on the Note in 2002. (Doc. 36, Lucrece Guy Aff., Exh. A, ¶ 6.)

Central to the Lozanos' case is their assertion that they paid off the Note by August 1990, by making two prepayments, but they contend they continued to make regular payments on the Note up through January 22, 2002, such that Ocwen and prior holders had no right to collect the 111 payments made since August 1990. (Doc. 1, "Plaintiffs' Original Petition, Exh. B, ¶ 12-16.) In the Lozano's Motion for Partial Summary Judgment, the Lozanos provide documents which they claim substantiated that all regularly scheduled payments were made on their Note, and that credit had not been given for $23,000 paid toward the principal on the Note in two lump sums. (Doc. 35, p. 2.) The Lozanos assert, and attach copies of checks which they claim show, that they made a payment toward principal of $12,000.00 on September 30, 1980, and a principal payment of $11,000.00 of June 1, 1981. (*Id.* at pp. 2-3; *See also* Tab III, Exh. E.) The Lozanos additionally assert their Note provided that prepayment would be applied toward their principal balance, though

such prepayment did not excuse the borrower from making each and every scheduled payment as they came due. (*Id*. at p. 3; Promissory Note, Tab. I, Exh. A.) The Lozanos argue that by making the alleged $23,000.00 in prepayments within twelve months of the date of the note, they raised the amount of principal by which each monthly payment reduced the principal balance; therefore, the Lozanos assert that the payments toward principal changed, or should have changed, from about $22.55 per month to about $123.00 per month after the $12,000.00 payment and then to about $264.00 toward principal after the $11,000.00 payment, such that the note was paid, or should have been paid, in an shorter time, by 1990. (Doc. 35, p. 3; *See also* Tab IV, Exh. F.) When Ocwen acquired the Note from Credit Suisse by a May 31, 1997 asset purchase agreement, the balance owing on the Lozano Note was $64,445.47. (Doc. 39, Exh. E, Schedule A (fourth loan down)). Furthermore, when Ocwen acquired the Note, the Note was in default. (*Id*., Guy Depo., Tab II, Exh. C, 19:14-21.) Ocwen subsequently sold the property claimed to be the security for the note at a foreclosure sale on March 3, 2003, the purchaser was Ocwen, and the sale amount was $93,930.00. (*Id.*, Tab V, Exh. G.)

Based upon the affidavit of Lucrece Guy, Ocwen asserts that it purchased the deed from the Resolution Trust Corporation ("RTC") in 1997. Ocwen asserts that the back of the Note in question reflects that the Lozano Note and Deed of Trust were subject to the following assignments: on February 7, 1989, the Note was assigned from University Savings Association to Federal Home Loan Bank of Dallas; on May 9, 1990, it was assigned by Federal Home Loan Bank of Dallas to the Resolution Trust Corporation ("RTC") as receiver for University Federal Savings Association; on November 15, 1990, the note was assigned by the RTC as receiver for University Savings Association to RTC as receiver for University Federal Savings Association; and thereafter, the Note, in an undated assignment, was assigned by RTC as receiver for University Federal Savings Association to Ryland Mortgage Company. (*Id*., Guy Aff., Exh. A.¶5; Doc. 35, Tab 1, Exh. A.) Ocwen purchased the Note from Credit Suisse First Boston Mortgage Capital LLC on May 31, 1997, at which time, Ryland Mortgage Company was the listed "Servicer" on the Note. (Doc. 39, Exh. E, pp. 1 & 4.) On December 17, 1997, the Mortgage/Deed of Trust on the Lozano's property was transferred by RTC to Ocwen Federal Bank, FSB, and was signed by the attorney-in-fact for the FDIC, being successor to the RTC, and as Vice President of the Ryland Mortgage Company. (Doc. 35, Exh. B.) Eventually, Ocwen sold the Note to LaSalle National Bank in 1998, but apparently remained the "servicer" of the Note. (Doc. 45, p. 3; Doc. 51, Exh. 4; Doc. 66, p. 4, ¶ 6, Admission of Fact Number 13.)

Ocwen argues the Lozanos knew as early as 1981 that University Savings had failed to credit the claimed $11,000 and $12,000 prepayments. (Doc. 36, Lozano Depo., Exh. G. at 19:19-20:21.) Neither of the year-end statements for 1980 or 1981 reflected the $11,000.00 payment or the $12,000.00 payment. (*Id*.) Mr. Lozano called University Savings to advise of the failure to credit these alleged prepayments. (*Id*. at Exh. G, 19:19-20:25, 22:3-10.) The 1982 statement likewise failed to reflect the credit. (*Id*. Exh. G, 74:22-75:8; Depo. Exh. G-23.) When the 1983 year-end statement did not reflect the $11,000 payment or the $12,000 payment, Mr. Lozano hired an attorney to contact University Savings to advise of the failure. (*Id*., Exh. G at 26:9-27:25.) However, the Lozanos received year-end statements for 1988 and 1990, and neither reflected either of the disputed payments. (*Id*. at Exh. G, 34:25-36:14; Depo. Exh's G-4 and G-5.) Mr. Lozano has stated that in twenty-plus years, he never saw a year-end statement that reflected the $23,000.00 worth of payments he made. (*Id*. at 30:14-18.)

When Ocwen acquired the Note, Mr. Lozano asserted at his deposition that he raised the issue of prepayments. (Doc. 36, Exh. G, 51:5-25.) Mr. Lozano states Ocwen told him at that time that the payments he made were "worthless," that University Savings was a "crooked outfit and that [Ocwen was] not bound by anything that they did to [him]," and that the payments he made would not be credited. (*Id*. at Exh. G, 52:1-18**.**) The Lozanos argue they relied upon this assertion. (Doc. 39, p. 6.)

Furthermore, in the Lozanos' bankruptcies, Ocwen argues the Lozanos affirmed their indebtedness and allegedly contradicted their claim of prepayment. (Doc. 36, p. 5.) In their Chapter 13 voluntary bankruptcy petition (Cause No. 96-45813-H5-13) filed on or about July 1, 1996, the Lozanos declared under penalty of perjury by their signature at the end of the Chapter 13 Plan Summary that such Summary "represent[ed] the terms of the plan proposed by the Debtor(s) for confirmation with respect to the treatment of all creditors and the distribution by the Chapter 13 Trustee." (*Id*. at Exh. G. at 37:18-38:14; Exh. E, p. 3.) Page three of the aforementioned Plan Summary reflects an amount for Total Liens and Encumbrances of $66,000.00. (*Id*. at Exh. E, p. 3.) Furthermore, in their Bankruptcy Petition, under "Schedule A - Real Property," a secured claim was listed in the amount of $66,000.00, on property described as "13802 Aspen Hollow Lane, Houston, Texas 77082," and the Lozanos also declared under penalty of perjury that the fifteen pages of summaries and schedules, including the aforementioned Schedule A, were true and correct. (*Id*., Exh. E.) John Lozano admitted at his deposition that this secured claim reflected the same indebtedness reflected on the original April 15, 1980, Note on the

property, and though Mr. Lozano asserts he brought it to the attention of his attorney or representative at the time that he contested this amount, no action was taken with respect to his demands. (*Id*. Exh. G, 38:11-40:6.) Ocwen asserts the amount of the debt - indicated in the schedules as reflected in the mortgage company's records - was true and correct. (*Id*. at p. 5 (*citing* Exh. G. at 37:18-38:23).) The attached Order Confirming the Chapter 13 Plan, signed by United States Bankruptcy Judge Karen Brown on January 14, 1997, also confirms in its Plan Summary a total amount of liens or encumbrances of $66,000.00. (*Id*. At Exh. G, 40:10-41:12.) Therefore, Ocwen asserts the schedule of assets approved by the court in confirming the Chapter 13 plan for the 1996 bankruptcy includes the debt on the Note without any credit for the disputed payments asserted by the Lozanos. (*Id*. at p. 5.)

Additionally, Ocwen puts forward two forbearance agreements entered into by the Lozanos with Ocwen, acknowledging the debt, and affirmatively modifying it by setting a new principal amount after Ocwen acquired the Note; further, Ocwen points out that Mr. Lozano was represented at the time by an attorney who recommended this as a "way out." (Doc. 36, Exh. G at 61:6-62:22; 65:3-66:2-12.) The evidence indicates that on May 30, 1999, both John and Susie Lozano executed a forbearance agreement by which the parties agreed that Ocwen would modify the existing loan so that an unpaid balance remained of $90,148.00, with a 12% interest rate, for a term of 27 years, with principal and interest payments in the amount of $938.85 plus escrow. (Doc. 36, Exh. A-1.) This forbearance agreement also stated that it was in return for Ocwen not foreclosing on the mortgage, which was in default, and that the outcome of any non-compliance with the agreement could result in Ocwen being immediately entitled to proceed with obtaining a Judgment Entry and Decree of Foreclosure, including but not limited to the initiation and completion of a Sheriff's Sale of the property. (*Id*. at Exh. A-1, ¶ 6(c).) On June 28, 2001, John Lozano signed another forebearance agreement in return for Ocwen not exercising its rights to remedy the Lozano's delinquency in return for future payments through June 1, 2002, in the amount of $1,953.40 and other terms. (*Id*. at Exh. A-2.)

Finally, Ocwen shows the Lozanos have claimed interest deductions on the federal tax returns for the interest which they have paid on the Note on the Aspen Hollow property. The Lozanos took a $12,818.10 deduction in Schedule A of their 1993 tax return for interest paid on the Note. (*Id*., Exh. G at 73:9-25; Depo. Exh. G-8) In addition, the Lozanos took a similar $7,373.46 deduction in 1994 (*Id*., Exh. G at 72:12-73:2; Depo. Exh. G-7), another $8,930.60 deduction in 1995 (*Id*., Exh. G at 70:18-72:5; Depo. Exh. G-6), a $3,156.87 deduction in 1998,

incorporated into the total itemized deduction of $7,100.00, based upon a Form 1098 sent by Ocwen showing this amount as mortgage interest paid (*Id.*, Exh. G at 69:11-70:1; Depo. Exh. G-5), and a $10,136 deduction on the Schedule A of their 2001 tax return (*Id.*, Exh. G at 74:10-18; Depo. Exh. G-9.)

Beyond arguing that their $23,000.00 in prepayments should have been credited to their Note, the Lozanos have argued, and Ocwen has admitted, that a gap exists in the chain of title to the Note. (Doc. 45, p. 3.) While the deed was passed from Ryland Mortgage to Ocwen, the Note was bought by Ocwen from Credit Suisse, and thus far the Note has not been traced from Credit Suisse to Ryland Mortgage. The Lozanos believe this defeats any claim of Ocwen to be a holder in due course, and opens for questioning any arguments based upon Ocwen's status as a holder. Furthermore, the Lozanos question whether Ocwen had the right to foreclose on their property in 2003, after it had sold the Note to LaSalle National Bank in 1998, and because it did not hold or own the Note at the time of foreclosure. The court notes, however, that Ocwen was retained as the "servicer of the Note" after the Sale to LaSalle, and the parties do not brief or argue that this status deprived Ocwen of the ability to foreclose on the Aspen Hollow property. (Doc. 55, p. 4, Admissions of Fact, ¶¶'s 13 & 16.) Ocwen counters the Lozanos arguments by arguing that its estoppel and statute of limitations arguments nevertheless remain unhindered by the Lozanos' arguments. (Doc. 45, p. 1.)

**III.     Analysis**

   **A. Judicial Estoppel**

Ocwen argues that in the Lozanos' 1996, 1998, and 2000 bankruptcies, the Lozanos repeatedly made sworn statements confirming their indebtedness on the Aspen Hollow property, and thereby denying their asserted prepayments by implication - the centerpiece of their suit. As stated *supra*, in the Lozanos' Bankruptcy Petition, under "Schedule A - Real Property," a secured claim was listed in the amount of $66,000.00, on property described as "13802 Aspen Hollow Lane, Houston, Texas 77082," and the Lozanos also declared under penalty of perjury that the fifteen pages of summaries and schedules, including the aforementioned Schedule A, were true and correct. (Doc. 36, Exh. E; Doc. 40, Exh. D.) Ocwen argues the bankruptcy court entered orders, specifically in 1997 and 1999, confirming and modifying the Lozanos' bankruptcy plan and acknowledging the Lozanos' indebtedness on the property. (Doc. 36, Exh's B & E.) In the Lozanos' 1998 bankruptcy, the Lozanos agreed to an order entered by the court in January 1999

whereby the Lozanos committed to paying the Note, by paying Ocwen, "until the indebtedness evidenced by said Note is fully paid." (*Id.*, Exh. B, p. 2.) Ocwen argues that John Lozano similarly represented under penalty of perjury in his 2000 bankruptcy that Ocwen held a secured claim of $8,000.00 on a secured indebtedness of $93,000.00, but the court cannot find evidence of these bankruptcy documents in the record.

Judicial estoppel bars a party who has made a sworn statement in a pleading, deposition, oral testimony, or affidavit in a judicial proceeding from maintaining a contrary position in a subsequent proceeding. *DeWoody v. Ripley*, 951 S.W.2d 935, 944 (Tex. App. - Fort Worth,1997, pet. dism'd by agr.) The elements of judicial estoppel are "1) a sworn, inconsistent statement made in a prior judicial proceeding; 2) the party who made the statement successfully maintained the prior position; 3) the prior statement was not made inadvertently or by mistake, fraud, or duress; and 4) the statement was deliberate, clear, and unequivocal." *In re M.M.O.*, 981 S.W.2d 72, 84 (Tex. App. - San Antonio 1998, no pet.)

Altogether, Ocwen argues, the Lozanos' statements in their bankruptcies constitute prior statements inconsistent with their present assertions of prepayment, and as the Lozanos do not argue that such repeated affirmations of their debt were made inadvertently, through mistake, fraud, or duress, but were made when the Lozanos were in fact represented by counsel, and such statements judicially estop the Lozanos current position in these proceedings. The court agrees with Ocwen that the Lozanos' assertions of prepayment in the present suit are precluded by Judicial Estoppel.

### B. Promissory Estoppel

Ocwen also argues that the Lozanos' execution of serial forbearance agreements affirming their indebtedness likewise estops them from denying their debt on the basis of prior prepayments in the instant action.

On May 30, 1999, the Lozanos induced Ocwen into a forbearance agreement whereby Ocwen agreed to forgo exercising its rights under the Note and Deed of Trust in exchange for the Lozanos' commitment to pay the debt. Both John and Susie Lozano executed this forbearance agreement agreeing that Ocwen would modify the existing loan so that an unpaid balance of $90,148.00 would remain, that an interest rate of 12% would be set, and that payments would continue for a term of 27 years with principal and interest payments in the amount of

$938.85 plus escrow. (Doc. 36, Exh. A-1.)³ Additionally, as described *supra*, on June 28, 2001, John Lozano signed another forbearance agreement in return for Ocwen not exercising its rights to remedy the Lozano's delinquency through foreclosure on the secured property. (Doc. 36, Exh. A-2.) In this agreement, John Lozano "acknowledg[ed] their default of certain terms of the Note and Mortgage and reaffirm[ed] their obligations thereunder," they acknowledged "by their execution and delivery hereof, that they have no defense, setoff or counterclaim with respect to the default or their obligation under the Note and Mortgage," and they affirmed that "[t]he reinstatement amount under the Note is $85,295.40 as of 6/26/01." (*Id*.) Furthermore, based on the Lozanos' interest deductions on their property on their tax returns, as described *supra*, Ocwen also argues that they cannot seek to recover those monies paid now.

Ocwen argues the Lozanos are estopped by their serial forbearance agreements from arguing prepayment because (1) the Lozanos made representations, (2) that they could foresee would be relied upon by Ocwen, and (3) Ocwen substantially relied upon the representations to its detriment. *See "Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937 (Tex. 1973) (*citing* Restatement, Contracts, §90 ("A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.")) Ocwen argues that because it forwent its ability to foreclose in consideration of the Lozanos' forbearance agreements, the Lozanos are hence barred from asserting prepayment here. The court agrees.

### C. Statue of Limitations

Finally, Ocwen asserts that the Lozanos cannot come to court twenty years after first having notice of Ocwen's predecessors' failure to credit the disputed payments and assert the payment defense to foreclosure on the Aspen Hollow property as their delay effected a bar by laches. Ocwen shows that the Lozanos have admitted they were aware that University Savings failed to credit the disputed prepayments and that they called to contest the failure in 1981, 1982, 1983, and 1984, and even hired an attorney in 1984 to resolve the dispute. (Doc. 36, Lozano Depo., Exh. G, 19:19-20:21, 22:3-7, 23:21-24:17, 26:9-27:25, 34:1-13; Exh's G-3.) Ocwen shows

---

³As described *supra*, by its terms this forbearance agreement was in return for Ocwen not foreclosing on the Lozanos' mortgage, which was in default at the time, and the agreement affirmed that the outcome of any non-compliance with the agreement would result in Ocwen being immediately entitled to proceed with obtaining a Judgment Entry and Decree of Foreclosure, including but not limited to the initiation and completion of a Sheriff's Sale of the property. (Doc. 36 at Exh. A-1, ¶ 6(c).)

that the Lozanos received year-end statements for the years 1988 and 1990, neither of which reflected credit for the disputed payments. (*Id*. at Exh's G-4, G-5.) Ocwen asserts the Lozanos raised the issue with their bankruptcy counsel in their 1996 bankruptcy and still did not bring these claims. (*Id*. at Exh. G, 37:18-40:6.)

The instant action was commenced in 2003. The Texas Deceptive Trade Practices Act requires that an action "be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Tex. Bus. & Com. Code § 17.565. A four-year limitations period governs fraud claims. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4). The limitations period for claims brought under the Federal Fair Debt Collection Practices Act is one year. 15 U.S.C. 1692k(d). Ocwen asserts that the Lozanos' claims are barred by the statute of limitations, as the foundation of their claims consists of the Lozanos' prior admissions which show their awareness that the prepayments had not been credited. The court agrees.

### D. Federal Fair Debt Collection Practices Act

Although the court *denied* the Lozanos request to amend their complaint to reurge a fraud count on a new factual basis, as different from their initial fraud claim (Doc. 69), on November 12, 2004, the court allowed the Lozanos to amend their complaint to allege a cause of action under the Federal Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq.*, and thereafter provided the parties an opportunity to supplement their dispositive motions in light of any amendments until February 15, 2005. (Doc. 56.) In its First Amended Response to Plaintiffs' Motion for Summary Judgment, Ocwen noted that the Lozanos' motion for leave to amend their complaint to allege a count under the FDCPA was pending. The court assumes that Ocwen's initial motion for summary judgment was therefore not intended to encompass the Lozanos' claims under the FDCPA. After the court permitted the Lozanos' amendment to allege such a claim, however, no further dispositve motions explicitly covering this claim were filed. In fact, in the Amended Joint Pretrial Order of March 17, 2005, the parties noted the pending claim under the FDCPA, yet Ocwen continued to assert that the "linchpin to the Lozanos' claims are the two prepayments." (Doc. 66, p. 2, ¶ 5(B).) Therefore, to the extent that the court's determination of estoppel precludes such a claim, or to the extent that the debt affirmed by the Lozanos over time bars their action as described above, their FDCPA claim is barred. However, the court notes that

the Lozanos have not clearly pled their FDCPA claim so as to allow the court to analyze it under the law if their claim is meant to rest on some alternative basis.

In their First Amended Complaint at paragraphs twenty-three (23) and thirty-three (33), the Lozanos asserted that

> Despite the plaintiffs' timely request for proof of the validity of the amount Ocwen claimed was due on the note, Ocwen in violation of the Fair Debt Collection act [sic] Section 1692g(b) of 15 U.S.C. failed to provide that information before having its lien against the property foreclosed March 3, 2003.
>
> ...
>
> The actions to foreclose against plaintiffs' homestead and evict them forcibly from that homestead are representations made to plaintiffs that Ocwen had rights and remedies under the terms of the note and deed of trust documents that it did not have and that are prohibited by law ("the representations"). Section 1692g(b) of 15 U.S.C.[4] specifically requires that all debt collection actions cease until plaintiffs' requested validation of the debt was provided. (Doc. 33, ¶¶'s 19 & 23.)

First, it must be noted that if the Lozanos are arguing that Ocwen did not have the right to assert their indebtedness in light of their prepayment, such claims are barred as argued *supra*. The Lozanos repeatedly reaffirmed their indebtedness on the Aspen Hollow property, even to Ocwen. However, if the Lozanos are attempting to argue some other claim and are drawing a fine distinction between their prepayment-based claims and some new claim, their allegations fail to inform the court what they are in fact alleging.

"To succeed on a claim under the Fair Debt Collection Practices Act, a plaintiff must first show that the money being collected qualifies as "debt" under the statute. 15 U.S.C. § 1692a(5). Second, the collecting entity must qualify as a "debt collector." 15 U.S.C. § 1692a(6). Third, a plaintiff must show that the debt collector violated 15 U.S.C. §§ 1692 - 1692o." *Berndt v. Fairfield Resorts, Inc.*, 337 F. Supp. 2d 1120, 1128 (W.D. Wis. 2004). Other than summarily alleging a count under the FDCPA, the Lozanos do not allege facts upon which such a claim could proceed, as there are no allegations or legal arguments in their later pleadings from which the court could determine whether Ocwen qualifies as a "debt collector" and whether the instant indebtedness qualifies as a "debt" under the Act. If the Lozanos are still arguing that Ocwen did not have the right to foreclose because the debt on the property was invalid, it is beyond argument

---

[4] 15 U.S.C. 1692g(b) states: Disputed debts. If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

that the Lozanos had previously admitted their indebtedness. Furthermore, the Fair Debt Collections Act typically applies only to debt collectors and "does not ordinarily include creditors who, directly or indirectly, try to collect debts owed them." *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1234 (5th Cir. 1997). To the extent the Lozanos could be seen as alleging that false representations were made to them, a false representation under the Act may involve "[t]he false representation of...the character, amount, or legal status of any debt." 15 U.S.C. 1692e(2)(A). However, the court cannot find that Ocwen falsely stated or misrepresented to the Lozanos that the Lozanos owed a continuing debt when the Lozanos themselves had allowed their debt on the Aspen Hollow property to remain outstanding, and had agreed to differing affirmations of that debt through the use of forbearance agreements and such over approximately a twenty year period.

Therefore, to the extent any remaining claim under the FDCPA remains pending, such is dismissed on the previous bases described, and also on the basis that such a claim has not been accurately plead so as to allow this court to analyze it.

**IV.        Conclusion**

The court understands that an assertion of $23,000.00 worth of lost prepayments is a weighty consideration; however, even as a matter of law, taking all of the Lozanos' assertions as true, the court cannot find that they have the ability to prevail. Accordingly, it is hereby

ORDERED that the Motion for Partial Summary Judgment of Plaintiffs John R. Lozano and Susie Lozano (Doc. 35) is DENIED, and the Motion of Defendant, Ocwen Loan Servicing, LLC f/k/a Ocwen Federal Bank, FSB for Summary Judgment (Doc. 36) is GRANTED.

SIGNED at Houston, Texas, this 29th day of September, 2005.

                                                                            _____
                                                                                         MELINDA HARMON
                                                                            UNITED STATES DISTRICT JUDGE